We'll now move on to our final argument of the morning, and that's United States v. L. Bahnasawy. Let me check if counsel is here. Mr. Frisch, are you on the line? Yes, Your Honor. Good afternoon. Good afternoon. Is it afternoon already? I guess it is. And Mr. Turner, are you on the line? Yes, Your Honor. I'm on the line. Okay. So, Mr. Frisch, you've got ten minutes. You've reserved two minutes for rebuttal, so that'll give you eight to start. You'll get a yellow light warning from Ms. Rodriguez at the seven-minute mark. Okay. You may proceed. Thank you. Thank you, Judge Sullivan. Equally responsible. These two words, equally responsible, help show why Judge Berman erred, why the error is structural, and why the error could not be even theoretically harmless. I was not permitted to be Mr. Bahnasawy's lawyer within the meaning of the Sixth Amendment. I was permitted to be half his lawyer. I was added to a team in which the judge preordained my percentage team membership, 50%. Why do you say that? This is Judge Sullivan. Why do you say that? I mean, people often have multiple lawyers, and they're each 100% a lawyer. They're not divided among 100%. There are cases in which defendants have more than one lawyer and have multiple lawyers, but not over the objection of the members of the team. The federal defender, Sabrina Schrock, who was 12 years at the federal defender, repeatedly, literally begged Judge Berman to relieve her, explaining to Judge Berman that she had not spoken to Mr. Bahnasawy in some time. I asked to come in in place of Ms. Schrock, and I was in the Department of Justice for 11 years with 30 years of experience under my belt, and Mr. Bahnasawy himself went through the colloquy, the questions submitted by the government, and answered them without flaw. No one's questioning the intelligence and knowingliness with which he answered those questions. The answer, Judge Sullivan, to your question is that the court had, Judge Berman had a united front at the defense table, telling him what the defense wanted. To impose percentage representation, to impose counsel, is not the right to counsel. We can call it a violation. We can call it interference. We can call it impairment, choose your noun, but once a judge gets involved, once a judge, as Judge Berman did, once a judge orchestrates it or interferes with it, or in the language of one case, acts as paren patriae, I think I'm pronouncing that correctly, once a judge does that, the right to make a defense is stripped of the individual character on which the Sixth Amendment insists. That's the language from- This is Judge Park. Can you point to anything practical about how your client was prejudiced by the arrangement? I know you've described sort of the constitutional or structural problem, but specifically, I don't really understand how having multiple lawyers prejudiced the client. Well, there are a number of things I want to say. Let me answer your question in two ways, but first, it's not just multiple lawyers. It's multiple lawyers who are at odds with one another, who don't want to be working with one another, and who the defendant doesn't want, at least not with regard to Ms. Schrock. Let me answer your question in two respects. There's this wonderful language in a Supreme Court case that judges cite and practitioners cite in Wheat, Wheat versus United States, and I'm going to paraphrase it, but it's part of the answer to your Honor's question. I'll come back and give the second part in a second. We view the right to counsel not with the wisdom of hindsight, but in the murkier context when relationships between parties are seen through a glass, darkly. One of the things we were plainly considering, as I point out in my brief, was whether or not to move to vacate the plea for a variety of reasons. The record on that point is not developed, but it's apparent from what the court knows about the case that a motion would have been based on Mr. Bonasowi's impairment, the give and take between him and Ms. Schrock at the time of the plea, what was going on at that time, his general incompetence, the nature of the case, his inability to form intent, that sort of thing. Judge Berman. So, excuse me. This is Judge Nardini. Isn't that an ineffective assistance claim? I mean, that would be the same claim if he only had one lawyer, right? If one lawyer was representing a defendant and was somehow impeding his expressed wish to the lawyer to, I don't know, move to withdraw the plea or testify on his behalf at trial or do one of the things that only a defendant is allowed to choose for himself, isn't that an ineffective assistance claim? And given that you said there's nothing in the record to develop it, isn't that something that could properly be raised only on a 2255 where the district court could, say, get affidavits from Mr. Bonasowi saying this is what he wanted to do, from the federal defender saying, yep, I tried to stop him. I was the one who stymied him. I mean, how are we supposed to deal with that sort of a claim in this forum? Well, so, Judge Nardini, I agree that this could be a proper basis for a petition under 2255. But it doesn't have to be. It is not appropriate for a judge to step in and tell the defense team who should represent the defendant in opposition to what he wants, in opposition to what the outgoing lawyer wants, especially someone as experienced as Mishra and the incoming lawyer who is experienced and has a track record as well. It's not for the judge to say, I want to do it this way. I want you to have both lawyers and more, I want them to be equally responsible. What's the reason for that? That is a structural error that goes to the right to counsel. We don't have to go toward a 2255 to address an error that is committed on the record before the court. Can I stop you? This is Judge Sullivan. Can I interrupt there? I mean, what the Supreme Court has said, and our court as well, is that this is structural really only when the situation is such that there's a lack of counsel, an actual or constructive denial of assistance of counsel altogether. That's not what happened here. Right here, what you're saying is there were too many cooks in the kitchen, but there's no suggestion that it lacked counsel altogether. Judge, the right to counsel can be established. The violation of the right to counsel can be established if it's a lawful or an incompetent lawyer, but it can also be established if the right to counsel is interfered with or impaired. He essentially had too many cooks in the kitchen when it is an individual choice. The heart of the right to counsel is for the defendant to decide what lawyer he wants and how he wants to navigate his defense. It is not for the court to impose what lawyer he should have or how the judge thinks the  That's why it's structural. We can't be in a position on a 2255 after an appeal where we're trying to go back and piece everything together and trying to thread the needle and go, well, if we had done this, we had done that. Why? Wouldn't it be useful to know what the cooks in the kitchen were doing? It would only strengthen the argument that is already made on the record before the court. Let's go back for a second and talk about why Judge Berman found it necessary or what the record says about why he appears to have wanted to balance interests or his integrity or fairness of proceedings, to use his words. It's not about scheduling. It's not about any conflict of interest that I had because Judge Berman let me in the case and adjourned sentencing. He adjourned it multiple times. It's not about Bonasawi's earlier equivocation because Judge Berman expressly told him he could change his mind and that Judge Berman would honor his decision. Judge Berman said, all you have to do is ask if you become dissatisfied for any reason at the page 14 of the appeal brief. Judge Berman says, well, everybody changes their mind and you can change your mind again, said Judge Berman. So what's the reason for requiring Judge, for requiring Mr. Bonasawi to have a particular attorney at the table with whom he hadn't spoken at some time who wants to be relieved and whom he doesn't want? The only issue that appears to have, the issue is a fair inference from what we know on the record is what Judge Berman said. He volunteered when counsel first appeared or the prospect of new counsel first appeared is that the plea was rock solid. He spoke about honoring the plea at page 18 to 19 of the sealed brief in the same breath. He talked about Bonasawi's right to counsel honoring the plea agreement already in effect. And he said, and this is as close to a direct quote, Ms. Schrock would not have proceeded along the path if she was not convinced it was in Bonasawi's best interest. And Ms. Schrock has a lot of cases to back that up. This is not a defendant's exercise of the right to counsel in the individual way to which the cases speak. This is a judge imposing how it's supposed to go. And we don't need to get into a fact presentation on the 2255 long after the fact to establish that what Judge Berman did here is structural error. It's imposing on Bonasawi what the judge wanted to happen, not what Bonasawi wanted to happen. Again, the government submitted a three-page list of questions. Bonasawi answered the questions flawlessly. The judge insisted that we get a transcript and that he have an opportunity to read it over at the MCC, which he did. And he said, no, this is what I want. Once a judge starts orchestrating things or interfering with the right to counsel or imposing on the team who should be what percentage of the representation, there's no right to counsel. It's not subject to harmless error analysis. Once Judge Berman denied Ms. Schrock's motion to be relieved and did not let me come into the case as his lawyer, as opposed to part of the team, the error was committed and the violation was committed. This is Judge Nardini. Can I ask, is there any indication in the record that the district court required the defendant to speak to the federal defenders after the question ruling? In other words, that he mandated not only that they not be released, in other words, that they still had an appearance in the record, but did they actually require that they meet with the defendant in certain times or places or that they draft certain pleadings? Did he ever mandate anything like that? Judge Nardini, no, but I don't know how Ms. Schrock, who's a very experienced lawyer, could take Judge Berman to dictate that she be equally responsible for his defense and walk away and not meet with Mr. Bonasawi. She couldn't do that. The prosecutors in their brief, they say, well, Mr. Bonasawi, echoing what Your Honor just asked me, could decide which set of lawyers would do what and he could control his defense. That's news to me and it's news to the record because it's not what happened. As Ms. Schrock herself said, the two sets of lawyers were trying or are trying to work together to accommodate Judge Berman. They're trying to congeal. Meanwhile, Mr. Bonasawi wants me to be his full lawyer, not 50%. There's a reason why there's nothing on the record about any meeting at the MCC attended by all of us, Ms. Schrock, me, and Mr. Bonasawi, because it didn't happen. There were two sets of lawyers trying to represent this one impaired, addicted young man and that's a violation of the right to counsel. There doesn't need to be more. Judges cannot, we cannot assure the reliable fact finding which the right to counsel helps us foster if judges from on high are saying, well, I want this lawyer to be 50% responsible for your defense and I want this other lawyer to be 50% responsible for this defense. It simply can't be subject to a harmless error analysis because we simply can't go back and try and recreate the record. We can't say, well, what's the prejudice? What would you have done? What kind of motion would you have made? It's the attorney-client relationship needs to play out in real time, unfettered by what a judge thinks about the case or the judge interference. That's one of the ways that the adversary system produces reliable fact finding. In the context of the defendant's right to counsel of choice, it does not permit the kind of post hoc analysis that the government says we should engage in. It just doesn't. That's the individual nature of the right to counsel, for better or worse, whether it's smart strategy or not smart strategy. If we're going to charge him, if we're going to assume his confidence, if we're going to charge him as an adult, it's his call. It's his call. And after much discussion and deliberation and the colloquy and all that went on that your honors have in front of the record, he said, you know what? I'm sure of it now. I'm a young man. I have problems. I was a teenager when I was 17 going on 18 or just turned 18 when I was arrested. And I've had all this time and I appreciate your honors questioning, but I haven't spoken to Ms. Schroff in some time. I want fresh. The judge opens a Pandora's box by imposing that on the lawyers who are in the position of trying to figure out, well, what do we do next? The judge wants us to do this. We're trying to accommodate Judge Berman, not our client, not our client. And that's at the heart of the Sixth Amendment. Lawyers cannot be, especially in a case like this, in any case, but especially in a difficult case like this, the lawyers have to be spending all of their time and all of their attention and all of their energy trying to figure out what do we do for the client? What do I do for the client? I can't be burdened. I can't be thinking about what does Judge Berman want me to do? What's he signaling to us? What's he trying to say by imposing this 50-50 representation? Respectfully to Judge Berman, it's not for him to say. And 250 years of jurisprudence of the rights of counsel backs me up. It's never been done before. It shouldn't have happened here. And by the way, Mr. Fish, I think we get the point. You're not citing any authority. You're just sort of citing pronouncements. Are there another issue you want to get to? I just want to make two points, Your Honor, if I could. I want to make it clear that the court understands. I want to talk a little bit about the sentencing. I'll be brief on that. I want to make clear to the court that I'm not asking for the key to the prison door for Mr. Bonacari. I'm simply asking that we go back to the point in time so that we can proceed as he wished. And as Mishra wanted to proceed, as he wanted to proceed, and as I wanted to proceed. On the sentencing issue, Judge Sullivan, I want to make this, I want to call out this particular point. And I understand that in any case, it's an uphill battle to show substantive unreasonableness. And the crime here is serious, but so too are the overwhelming mitigating circumstances and the disparity between the statutorily required care in Canada and the indisputable absence of available care in the United States. Here's why, here's one major reason why I take issue, I think the court should take issue with Judge Berman's sentence. As the government points out, he put in the judgment, I consent to a treaty transfer, or I will consent to a treaty transfer if it comes before me. I think that's the language of the judgment. But that requires the government's consent, the treaty transfer from the United States to the government. And it's been a long time, the government no longer consents to those kinds of treaty transfers, especially in a case like this. So why defer to the government? Why say, well, if the government consents, I'll consent. Why not do it now? It's sentencing. Why not tell the defendant and the parties, I think the minimum sentence that he should serve before a treaty transfer is two years, or five years, or 10 years. By doing what he did, by saying, well, I consent to a treaty transfer, but I understand the government has to consent before anything happens, he essentially leaves us out of luck. And this young man, who was a teenager in his bedroom in Toronto on the internet, with a documented history of impairments and addictions, and undeniable progress while in custody. These doctors, the two who testified, Drs. Calderfield and Mariani, and the others, Drs. Khedivi, Zanakis, Bailey, these aren't hired guns. These are the best of the best in this area. And they testified to the truth, that he had turned the corner, that he no longer obsessed on things, that he was evolving as people evolve from adolescents into their 20s, but he also was no longer obsessing or fixating things of the types of things that contributed to his conduct in this case. I think the sentence of 40 years for someone who committed these crimes, 17 going on 18, where he's not going to get in the United States anything close to the care he needs, is in fact shocking. And the government cannot cite to any case, any case, with this mix of mitigating circumstances where anything close to this kind of a sentence has been imposed. All right.  Mr. Pritchett, you have two minutes for rebuttal. We'll hear from Mr. Turner. Thank you, Your Honor. And may it please the Court, my name is George Turner, and I'm an assistant direct attorney in the Southern District of New York. I represent the government on this appeal. I also represented the government in the proceedings below. I'd like to start with the sentencing challenge, which is where Mr. Pritchett left off. Hey, Mr. Turner, I don't know if, Mr. Turner, if you could get closer to the mouthpiece or off a speaker, I'm not sure, I'm having a little trouble hearing you. I'm not sure if the others are. I apologize, is that any better? It's a little better, but go ahead, we'll see. Your Honor, is that any better? That's better for me, yes. I apologize, it may have been an issue with my earphones. If that's better for the Court, I will proceed. Okay, go ahead. I'll start with the sentencing challenge, which is where Mr. Frisch left off. The defendant in this case plotted to carry out a mass casualty terrorist attack in New York City for ISIS. The defendant radicalized, joined ISIS's global online network, worked online for ISIS, and began plotting with a high-ranking ISIS member in Syria to carry out a large-scale attack on U.S. soil. And that was all before he had any contact with undercover law enforcement. The defendant recruited other ISIS operatives to join the plot. He developed attack plans targeting the subway system and Times Square. He acquired bomb-making materials, and he ultimately traveled from Canada to the New York City area, intending to execute the attack. The FBI managed to infiltrate and thwart what was a live terrorist plot. It posed a real and significant threat to New York City in the spring of 2016. And then, after his arrest, the defendant scrawled terrifying statements and images on his cell walls, reaffirming his allegiance to ISIS and his desire to carry out an attack. The defendant was a radicalized terrorist who posed an extreme risk to society, and Judge Berman recognized that. The sentencing guidelines called for life imprisonment in this case, and a life sentence would have been consistent with terrorism cases in this circuit and across the country involving defendants like this one who plotted to commit a serious attack that was ultimately thwarted or unsuccessful. Judge Berman carefully considered all of the relevant factors, aggravating and mitigating over multiple lengthy sentencing proceedings. And the 40-year sentence that he imposed, which was substantially below guidelines, was well within the range of reasonable sentences. I'll turn now to the counsel issue that's been raised on appeal, and we submit it's important to start with this. The defendant did get to choose his lawyers, as some of the panel's questions have alluded to. Judge Berman allowed new counsel to enter the case. There simply was no denial of the defendant's qualified right to counsel of his choice. And far from suffering any prejudice, he received excellent representation from multiple sets of experienced attorneys as a result. And I'd like to pause and address the equally responsible argument that Mr. Frisch has made. There's very heavy reliance on that one phrase throughout the panel's briefing. There is no support in the record that that comment resulted in any prejudice or impacted strategy. The defendant controlled his representation. The analogy has been made about multiple cooks in the kitchen. The defendant could decide which cook would cook his food. And importantly, the record, there is nothing in the record suggesting that Judge Berman ever tried to dictate which set of lawyers would do what. And in fact, both sets of lawyers participated in the briefing and the oral advocacy that took place at sentencing. Again, there was just no prejudice that resulted from Judge Berman's decision. Now, with respect to that decision, the decision that's really at issue, which was not a denial, a decision not to relieve the federal defenders and to keep them on the case, that decision was supported by a multitude of factors. The federal defender had represented the defendant from the inception of the case, which had a long and complex history, and the substitution request came on the eve of sentencing. So continuity of counsel was a particularly important consideration. And throughout the case, including as recently as just a few weeks before the substitution request, the defendant had repeatedly said that he did not want the lawyers that his parents were pushing on him and that he was happy with federal defenders. And even that if new counsel did enter the case, he wanted federal defenders to remain as co-counsel. And on top of all of that, new counsel had a potential conflict that they were retained and paid by the defendant's parents, whose views had diverged dramatically from the defendant on what was in his best interest over the course of the case. So against that backdrop, it was eminently prudent for Judge Berman to keep federal defenders on the case with new counsel to ensure the integrity and fairness of the proceedings. There certainly was no abuse of discretion, which is the applicable standard. Now, a couple other points that I'd like to address that Mr. Frisch has focused on today. First, the suggestion that Judge Berman somehow was acting to insulate the guilty plea in this case is speculative, and there is no support in the record for that. Judge Berman's thorough and careful explanation of his decision, and it's at pages 126 to 36 of the appendix, make very clear that his decision was grounded in ensuring that the defendant had effective advocacy. Also, Judge Berman took steps throughout the case that were utterly inconsistent with some surreptitious desire to hamstring new counsel. He ordered the government to meet and confer with prospective new counsel. He sua sponte modified the sealing order so that new counsel would have access to information should they come into the case. So the suggestion that this was somehow tied to insulating the guilty plea is without support in the record. As far as mitigating considerations in connection with sentencing, Judge Berman considered those at length over the course of multiple sentencing proceedings, and it's worth noting that he expressly identified the mitigating considerations of the defendant's youth and mental health issues and addiction issues as the reason why he was varying downwards substantially from the applicable guidelines range. Last two points I'd like to make. One is on sentencing, and one is on the counsel issue with respect to two points that Mr. Frisch has made today. The first is that Mr. Frisch continuously refers to structural error, and the cases cited in our briefing and the Gonzalez-Lopez Supreme Court case cited in the defendant's briefs make clear that if, yes, if there is an erroneous deprivation of counsel of choice, that is a structural error. Here, and what the appellant elides over, is that there was no deprivation of counsel of choice, and that even in cases where that is the issue being analyzed, the trial court has broad discretion to balance what is a qualified right to counsel of choice against other important considerations such as fair administration of justice, integrity of proceedings, unreasonable delay, which is exactly what Judge Berman did in this case. The last point I'll make for the court, for the panel, is that Mr. Frisch made the assertion that we can't point to any case where a comparable sentence was imposed. We cited in our sentencing submission below an array of cases, and this is at pages 323 to 327 of the sealed supplemental appendix, an array of cases involving serious terrorist attack plots like this one, serious terrorist attack plots that were thwarted where the defendant received a life sentence. I will simply note two which are among the most analogous, United States versus Qadir, 718 F3rd 115, a case in this circuit that involved a conspiracy to commit a terrorist attack where FBI gained confidential informant access, and it was ultimately thwarted. There was a life sentence. It was affirmed by this court. A substantive reasonable challenge was rejected, finding that the gravity of the plot justified the life sentence, and the other case, we cited it below, Jabara, a Canadian teenager who plotted to carry out an ultimately thwarted attack. The parallels are striking, and at the end of the day, Judge Berman made the very reasonable conclusion that this was a unique case. This is page 252 of the appendix. There was no perfect analog, but what he did do is analyze all of the factors and come up with a sentence that was well within the range of reasonable sentences. We submit the judgment of conviction should be affirmed. All right. Thank you very much, Mr. Turner. We'll now hear from Mr. Frisch for two minutes of rebuttal. Thank you, Judge Sullivan. You know, as I listen to Mr. Turner, I'm thinking of one thing which underlies both points of appeal, which is indisputed, indisputable. Mr. Banasawi was a sick teenager. He had a history of addiction and impairments and treatments that are perhaps unparalleled even as to what we as practitioners in the Second Circuit see as extraordinary, moving back and forth from country to country, serious addictions, not being able to stay away from the drugs available at the MCC, pretty serious, pretty serious circumstance. And here he is being told by the judge that two sets of lawyers, he could not control his representation. It would be difficult for him if he had one set of lawyers, one set of lawyers, Mr. Shroff, Ms. Shroff and Mr. Kaminsky on the one hand, me and Mr. Wright on the other. And now he's told the two sets of lawyers who have different strategies and a different way of looking at things, who are not meeting with him together, who, as Ms. Shroff said, are trying to work together, trying to congeal, which establishes a lack of congealing. You have one more minute. Thank you, Maria. He needed to be represented by one voice, and it's not adequate to say, well, do it on a 2255. The standard on a 2255 as to effective assistance to counsel is almost unattainably high, because whatever a defense lawyer does can almost always be understood or interpreted as a strategy. This defendant had a right to be represented by counsel of his choice at the time, while before sentence was imposed, while everything was unfolding, the fluidity, the dynamics of a litigation, while the judge was hearing the case and learning about the case. He had that right, not to have to go to Judge Berman after the fact and try and convince him that a lawyer was ineffective in pursuing a particular strategy. He may be forced to make that application. We'll make it strongly. We believe we'll have a strong argument, but we need him to get there. And let me end with this. I hear Mr. Turner's point about all the reasons why he speculates that Judge Berman did what he did, but the reasons that he gave are plainly not it. The parents paying for their son's legal fees, well, to the extent that is an apparent conflict that was resolved by the colony, so that's not it. The delay in sentencing, well, that's not it, because once I was permitted into the case, the judge put off sentencing and did it multiple times. That he wouldn't get effective advocacy, well, I think Judge Berman understood that the lawyer coming in was extremely experienced and highly competent. And certainly the treatment would continue as it did. There's one reason why Judge Berman, and he said it. It's not speculation. He said it. What he was concerned about was whether or not the plea would be challenged. For some reasons that are apparent on the record, others that we'd have to fill out the record. But the time to do that was then. Not to say in retrospect after many years in jail on a standard that's so difficult to meet that Mishra was ineffective. He had the right to do it then. Not for Judge Berman to step in and protect the guilty plea. If any such motion was without merit, presumably Judge Berman would deny it. But if not, and if we were persuasive enough with Judge Berman, he might rethink the case and we wouldn't be having this argument right now. There might have been a different result. And meanwhile, Mr. Banasawi is facing a 40-year term of imprisonment. A young man facing 40 years, essentially the rest of his life. And I want to end with this point, Your Honor. It's not surprising to me that Mr. Turner did not discuss my argument about the treaty because the United States is not going to consent to his treaty transfer. And Judge Berman himself, under all the overwhelming mitigating circumstances in this case, understood the wisdom and the prudence of their being a treaty transfer. Where Judge Berman erred was in deferring to the government's consent one day, but he should not have done it. He should have determined what sentence would be appropriate before Mr. Banasawi returned to Canada, set appropriate conditions, and let him go so he can get the treatment that he needs. But today, this young man, who was 17 going on 18, when he was arrested and engaging in this conduct, is facing the rest of his life in jail. And under these circumstances, that's not acceptable in my view. All right. Thank you, Mr. Frisch. We will reserve decision. Thank you both. Well argued. We have one other matter on the calendar today, but it's not for argument, so it's on submission. We'll reserve on that as well. So that concludes the morning's arguments. I want to thank everybody for being on time and working with the phones, which makes it a little difficult. We'd love to be in person, but that's not possible right now. I really want to commend the IT folks and Ms. Rodriguez and all the folks in the clerk's office who have made this possible. I'm always impressed with how well this has been going in light of the circumstances. So today is no exception. So thanks very much. Have a good day. The court is adjourned. Court stands adjourned.